UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

IN RE:                                                    Case No.: 13-14289-RBR
                                                          Chapter 11
THE FORT LAUDERDALE
BRIDGE CLUB, INC.,

    Debtor.
_____/

STATE OF FLORIDA      )
                      ) ss:
COUNTY OF BROWARD     )

## AFFIDAVIT OF ROSEN

    SAMUEL D. (a/k/a "SANDY") ROSEN ("Rosen"), being duly sworn, deposes and says:

    1.    I am, for all intents and purposes, the only creditor of Debtor, The Fort Lauderdale Bridge Club ("Debtor"). I am in agreement with certain portions of the motion filed by Debtor to partially lift the bankruptcy stay (DE #19) styled Debtor's Motion to Allow Samuel D. Rosen Limited Relief From the Automatic Stay and Determine that Arbitration Claim is Derivative or Alternatively to Stay Claim ("Debtor's Motion for Stay Relief"), I respectfully submit this Affidavit to set forth the disagreements I have with that motion and the reasons therefore, as well as in support of my Motion to Convert this Case to Chapter 7.

    2.    By way of background, I was an attorney from a foreign jurisdiction and retired from the practice of law ten years ago. In my retirement, I decided to write a book on bidding systems for the game of bridge predicated upon my avocation, mathematics. I hasten to add that although I have played bridge for over 50 years I do not do so for enjoyment, recreation or amusement. Since 2007, I have played bridge in order to Beta test my mathematics-based bidding systems. When I was up to about the 10th draft of my book, I determined it was time to start Beta testing it with and against the best bridge players I could find who are, therefore, in the best position to provide feedback. Towards that end I began commuting almost daily from my

home in Bal Harbour to the Fort Lauderdale Club (a round trip of one hour and forty minutes) because Fort Lauderdale had by far the best players in South Florida.

3.  In February, 2010 after I had expended thousands and thousands of dollars in developing my system, paying professionals to critique and test them in play, and more than a thousand hours in testing myself, I was expelled by the Bridge Club at the insistence of the then Club Manager (thereafter fired) on trumped up charges of improper behavior. My expulsion, punctuated by the Club Manager's resignation and threat not to return to the Club until I was expelled and then engineered by a couple of Board members and an attorney is the subject of the lawsuit I filed in May of 2010 asserting claims of improper expulsion under the By-Laws, violation of the procedures prescribed by Robert's Rules of Order incorporated into the By-Laws, and violation of my basic rights to procedural due process guaranteed to all members of Not-For-Profit organizations pursuant to the Florida Not-For-Profit Statute Chapter 617.0607. The action – referred to as "Rosen I" in Debtor's Motion for Stay Relief – also included related claims of defamation and breach of fiduciary duty. I hasten to add that in 50 years of playing bridge across this entire country and in foreign countries from London to France to Germany and to South Korea, there has never been a single instance in which anyone has ever questioned, let along complained of my behavior.

4.  Pursuant to the Club's Directors and Officers insurance policy, the carrier appointed the law firm of Luks, Santaniello to defend all of the defendants in the case, including the Club, but denied the Club any coverage for indemnification, the Club being the owner of the policy but not a listed insured. On November 12, 2010, the Broward County Circuit Court (Judge Weinstein) heard my Motion for Summary Judgment of Liability against the Club on the breach claims and from the bench, summarily granted my motion on Count 1 of my pleading, directing my immediate reinstatement and reserving for jury trial the quantum of damages to be awarded. Critically because of the policy, Rosen I has not cost the Club one dime to defend, the carrier paying 100 percent of those costs.

5.  The status of Rosen I is that the case is still not at issue and before it reaches that point, the Court is going to hear motions respecting misconduct by and disqualifications of defense counsel, sanctions to be awarded for discovery and other misconduct, and will determine whether to strike the pleadings of the defendants, including the Club, for repeated discovery

misconduct, misconduct which geometrically increased my legal fees and expenses for that case to about $175,000 for which the Court will decide on reimbursement to me and by whom.

6. Having been offended by the outright lawlessness of the Club and its officials, but grateful that I had the financial wherewithal to resist, in January 2011, I for the first time started becoming more attuned to and involved in what was going on at the Club. What I found was shocking and without going into details, suffice to say that in early 2011 I provided the Club's Board with the 90 day demand, the pre-suit requirement for a derivative action provided in Florida Statutes Chapter 617.07401. In May 2011, the Club and its officials having totally ignored my demands for correction of misconduct, I filed a derivative action under the statute, a case which Debtor refers to as "Rosen II".

7. As per the statute, the Club was included as a party simply because it is required and as I made clear, explicitly, in my pleading, no relief was sought against the Club. To the contrary, the derivative action consisting of three Counts (on two of which I already won summary judgment) including a Count that the prior President of the Club, Guida, had misappropriated substantial monies from the Club and disbursed them to his friend, the Club's Manager and used the Club's funds as currency to pay his attorney. The claim asks for a judgment against Guida and in favor of the Club, thereby reimbursing the Club for the money Guida misappropriated in the approximate amount of $20,000 plus, if allowed by the Court after a hearing set for May 13, punitive damages.

8. If there is one thing that the claim against Guida demonstrates (and my pleading explicitly reaffirms it) is that the position of the Club is one of a putative plaintiff against whom no relief is sought and the Club will enjoy 100 percent of the recovery that I obtain against Guida. As the Florida Statute makes clear, I can recover nothing, zero, not even a "commission" from a judgment I obtain against Guida. Thus, the Club was in the most enviable position of sitting back, doing nothing, spending not a dime, and if I lost, the transactional cost were for my own account, but if I won, the whole of the recovery went to the Club.

9. Defense of Rosen II was paid for and continues to be paid for by the carrier in the person of the same firm, Luks, Santaniello, who appears as counsel both for the victim, the Club, and for the perpetrator, Guida.

3

10. In January of 2012, I learned of even more serious violations of law and misappropriations by Club officials and therefore provided yet another 90 day demand under the Florida Statute. When the demand was ignored I filed suit in May of 2012 – a lawsuit referred to by Debtor, "Rosen III" – alleging eight counts of serious misconducts of which the Club was the victim.. Four of the Counts were the same exact kind of misconduct as alleged against Guida in Rosen II, i.e. misappropriation of Club monies. The defendants in Rosen III were Ms. Engleman, the President of the Club in 2011, Mr. Bozek, the President of the Club starting in January 2012 and Mr. Gellman, the Treasurer of the Club. In addition, derivative claims were asserted on behalf of the Club against former Manager Cronrath and Club member-attorney de Young, both of whom caused the Club to become complicit in their own personal tax fraud by getting the Club to refrain from properly reporting their income. Once again, and I am obliged to underscore this, there were no claims asserted against the Club, no relief sought against the Club, and the Club was in the same enviable position of being the putative plaintiff which could sit back, watch me expend time and money to assert these derivative claims, and if I lose, it costs the Club nothing, but if I win, the Club gets 100 percent of the recovery and all I could ever hope for is that the Court, recognizing my contribution, will award the taxable costs and attorneys fees.

11. With the service of process in Rosen III in May of 2012, President Bozek who dominates the Board many of whose members are the 75 year old people described in Debtor's motion, took the following action:

a. Bozek appointed himself, and demanded and received Board approval, as the head of the Litigation Committee to have sole responsibility to deal with the attorneys and to direct the defense of the various cases without a single other Board member on that committee;

b. Bozek alone determined – and continues to do so to this day – what events in the litigations he reports to the Board members and what not, as well as what if anything (i.e. nothing) he reports to the 750 members of the Club; and

c. Since there was no longer an insurance policy, Bozek determined, with the supposed approval of the somnambulant sycophants on the Board that Bozek and the other Board members who were sued for misappropriating Club monies ought not be burdened with having to defend themselves, but rather, that the Club should pay for their defense and, to boot, indemnify

4

them if they lost. Consider please the arrogance here. To analogize, the Club is a 7-11 which was just robbed. The perpetrators are the trusted fiduciaries who then decide that the victim must pay for their defense. And to boot, as some of these defendants have already testified to in deposition, if the Court finds e.g. Bozek guilty of having misappropriated Club assets and a judgment is entered against Bozek directing him to **reimburse the Club** then Bozek is entitled to indemnification **from the Club** so win or lose, Bozek pays nothing and only the Club will lose.

12. While Florida law permits a corporation to advance monies for defense costs of an officer sued in certain circumstances, the statutory requirement is that the individual provide an "undertaking" that he will reimburse the Club if he is found to be in the wrong. Naturally, not Bozek nor any of the other defendants have provided such an undertaking and in fact some of them have already testified that regardless of whether they win or lose, they have no obligation to reimburse the Club for the monies expended because the Club, i.e Bozek, has provided them indemnification.

13. In about June 2012, Bozek proceeded to engage a law firm to defend all of the defendants in Rosen III. Upon information and belief from July or August of 2012 to February 2013, Bozek, the only Board member to get the bills from the lawyers, approved and directed Gellman, the Treasurer to pay, bills totaling approximately $85,000., all paid by the Club. When I found out about this, I filed a Motion to Amend my Complaint in Rosen II to add seven Counts including to recover these monies misappropriated from the Club to pay for the personal defense for Bozek, et al. On February 20th, 2013 the Court granted the motion and now carrier appointed counsel who had already been defending the Guida claim in Rosen II is now defending all of the claims via amendment. This, the Club has not and will not incur one dime in defense costs of Rosen II.

14. The Debtor's Motion for Stay Relief (at Paragraph 10) disingenuously asserts that the Bridge Club's financial fortunes have been decimated by the litigation I have commenced. A like claim is made in the Debtor's Case Management Summary signed by Bozek and defense counsel which asserts (at P. 1) that the reason for filing the Chapter 11 petition is not because the Club isn't solvent, not because the Club cannot pay its debts as they become due, but rather, because of the "substantial litigation, primarily involving derivative claims..." the Club is involved in. In truth, however, the Club has paid not one dime in defense of Rosen I, has not

5

paid one dime in defense of Rosen II (original and amended) and would not have paid one dime respecting Rosen III but for Bozek's decision to raid the Club's piggy bank to pay for his legal defense. In addition, I am obliged to note as Debtor and counsel well know, separate and apart from the Club's monies misappropriated by Bozek for his defense in Rosen III, the Club's finances have long been in a death spiral, its income going down every single year for several years for the simple reason that members of the Club chose to play bridge elsewhere. The severity of this, which Debtor and its counsel is none, is that in the nolt recent month, this "table count" (number of people playing) is down 25% year over year.

15. Respecting Rosen III, if I prevail as I am confident I will on summary judgment of liability, on at least four of the claims, the Club stands to recover perhaps $10,000 or more at trial in restitution, plus what I expect to be a substantial amount of putative damages a jury should award against people who are the trusted fiduciaries and protectors of the Club's fisc. Respecting the claims now added in Rosen II, the compensatory damages alone will exceed $100,000. Needless to say, these two derivative actions are substantial assets of the Club which ought be recovered against the wrongdoers and made available to pay the creditors.

16. The last proceeding, denominated as "Rosen IV" by Debtor is an arbitration I commenced against Bozek and the other Officers of the Club for willful breach of fiduciary duty in misrepresenting to the membership a set of amendments to the Club's By-Laws and which based upon those misrepresentations were passed by the members on December 20th, 2012. To give the Court a flavor of what Bozek did, he and the others represented to the members that there was no need for discussion of the proposed amendments and that in fact they had provided the members a "summary" of the highlights of the proposed amendments. The summary, however, failed to disclose that one of the amendments was to strip every single member of the club of his or her rights as a shareholder under Florida law so that the members no longer own any of the assets of the Club. The arbitration is not filed as a derivative action; it is a direct claim by me against the wrong doers for breach of fiduciary duty. There is no request that the By-Laws be changed or the amendments thereto be vacated. Rather the claim is simply that having willfully misrepresented the By-Law changes, Bozek, et al., ought be obliged to indemnify me for loss of my shareholder rights. The Club is not a party to the arbitration, there is no claim against it, no relief is sought against it, and it will not receive any benefit from the outcome of

the arbitration. Notwithstanding this, Debtor asserts in its Motion for Stay Relief (at Paragraph 19) the illogical proposition that because I asserted this claim in arbitration (as now required by the December 2012 Amendments to the By-Laws) it follows a priori that the claims in arbitration are "derivative in nature and are property of the bankruptcy estate."

## MY STATED PREFERENCE FOR RESOLUTION

17.   On over a dozen occasions going back over three years, I have attempted to settle my claims against the Club in Rosen I, the only claims asserted against the Club in any of these litigations. I have been rejected at every turn, the Club refusing to even discuss settlement except when, in June 2012, Bozek offered to give me $1,000.00 to abandon my derivative claims in Rosen III, the wholly improper proposal which, as a statutory representative of a class of members, I could never accept.

18.   Indeed, as recently as at the Board's monthly meetings of January and February of this year, I implored the Bozek Board to sit down and settle Rosen I. In fact, I went so far as to file a motion in Rosen I before the Chapter 11 petition intervened, asserting to the Court that even though I won summary judgment of liability on Count I, I would forego my right to damages if the Court would enter a final judgment on Count I and award me **only** my taxable costs (approximately $13,000). That motion was blocked by the bankruptcy petition but more importantly, Debtor has even objected to this olive branch, refusing to even agree, and to its own detriment, my claim for damages on Count I continues.

19.   Debtor's Motion for Stay Relief (at Paragraph 27) talks about good faith settlement efforts which have been unsuccessful. Debtor is correct that settlement efforts have been unsuccessful and they will continue to be so until the derivative claims in Rosen II and III are quantified. The conundrum here is as follows:

   a.   Debtor, with only about $150,000 left in cash and losing money every month, would like to settle my claims against it under Rosen I. Those claims, however, including damages, putative damages, costs and attorneys fees will far exceed Debtor's current assets;

   b.   Debtor, having no insurance coverage for indemnification for damages or attorneys fees in Rosen I, pleads that it cannot afford to pay me even a significant fraction of my

7

expected recovery in Rosen I. Pleading poverty, Debtor asks me to give it a substantial financial break;

    c.    It is in my own personal interest that the Bridge Club survive so I have a place to continue to pay and complete my beta testing. The last thing in the world I want is to see it be liquidated. However, I am not willing to entertain any plea for a deep discount based on poverty at a time when the Debtor stands as the putative plaintiff who may well be entitled to recover in Rosen II and III far more than even my claim. Apparently not understanding this, Debtor and its attorneys ask in their Motion for Stay Relief that the stay not be lifted with respect to any derivative claims, i.e. all of the claims in Rosen III and all but one of them in Rosen II. It is therefore the Debtor with its wrong-headed thinking of protecting President Bozek from the ongoing litigation in Rosen II and III, who asserts that these cases which will bring money into the Debtor should not go forward. One might fairly ask whose interest the Debtor and its counsel are truly serving.

## DEBTOR'S MOTION FOR STAY RELIEF

20.    I agree with Debtor's position that the stay of Rosen I should be lifted entirely, including appeals, and that the case be allowed to proceed to a final judgment liquidating the amount of my claim but without my ability to seek to collect upon that judgment against Debtor without this Court's permission.

21.    Similarly, I agree with so much of Debtor's motion which would lift the stay for all purposes for Count X of Rosen II.

22.    I vigorously disagree with Debtor's position that the stay remain in place for all of the derivative claims in Rosen II and III and perhaps on the return date of this motion, Debtor can explain to this Court why it is in Debtor's best interest that, e.g., the claim against Guida for misappropriating the Club's money (the facts of which Guida has already admitted under oath) should not proceed to entry of a judgment in favor of the Debtor and collection thereof. Perhaps Debtor would be able to explain to this Court why the claim in Rosen II to recover what may be close to $100,000 from Bozek et al., of the Club's assets and improperly taken by them to pay for their personal defense not go forward to judgment. I appreciate that Debtor a corporate entity controlled by Bozek (who hired bankruptcy counsel and who signed the Chapter 11

8

Petition) may have to make a choice as to whether to protect itself or to protect its president. Perhaps this Court can help to do so.

_____
Samuel D. Rosen

STATE OF FLORIDA       )
                       ) ss:
COUNTY OF BROWARD      )

The foregoing instrument was acknowledged before me this <u>10th</u> day of April, 2013, by Samuel D. Rosen who is personally known to me and who did not take an oath.

SWORN TO AND SUBSCRIBED before me this
10th day of April, 2013, in Broward County, Florida.

_____
Notary Public, STATE of FLORIDA

My commission Expires:

> BETH C. FIERBERG
> MY COMMISSION # EE 100248
> EXPIRES: October 12, 2013
> Bonded Thru Notary Public Underwriters

J:\WPDocs\5100 Samuel Rosen - Ft Lauderdale Bridge Club\Pleadings\Affidavit re Motion to Convert Case to Chapter 7.doc