UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:                                                                  Chapter 11

THE FORT LAUDERDALE                                 Case No. 13-14289-RBR
BRIDGE CLUB, INC.

      Debtor.
_____/

## DEBTOR'S *OPPOSITION TO SAMUEL D. ROSEN'S MOTION TO CONVERT CASE FROM CHAPTER 11 TO CHAPTER 7*

THE FORT LAUDERDALE BRIDGE CLUB, INC. (the "Debtor"), by and through undersigned counsel, files this its Opposition to Samuel D. Rosen's Motion to Convert Case to Chapter 7 and states:

1. On February 26, 2013 (the "Petition Date"), Debtor filed a voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Since that time, the Debtor has operated as Debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2. As of the date hereof, no creditors committee has been appointed in this case. In addition, no trustee or examiner has been appointed.

3. The Fort Lauderdale Bridge Club, Inc. ("Bridge Club") is a non profit 501(c)(7) Florida corporation and has managed and operated a bridge club in Fort Lauderdale, Florida since 1958.

4. The Bridge Club has served and continues to serve a special and unique purpose in the City of Fort Lauderdale and throughout the region as a well run and respected facility for residents, primarily elderly, to compete and enjoy the game of bridge at all skill levels. It has been and remains one of the top bridge clubs in the country.

5. The Bridge Club has approximately 600 members at the present time and those

members, as well as many guest who participate in events at the Bridge Club, rely on the club as a place to enjoy the game they love, socialize and be intellectually stimulated. The average age of the Bridge Club Membership is approximately 75. The members pay an annual membership fee of $25.00. Most of the revenues are derived from members paying for card game fees. The gross revenues for 2012 were $272,594, above 2011 amount of $264,102.

6. The Bridge Club is also unique in that the City of Fort Lauderdale has long recognized the social and community benefit to the Bridge Club by entering into and continuing a long term Lease for use of the land located at 700 N.E. 6th Terrace in Fort Lauderdale, located within Holiday Park down the street from the War Memorial Auditorium. The lease is $10.60 per year and clearly a valuable and critical element of the Bridge Club. The Debtor has filed a Motion to Assume the long term executory contract with the City of Fort Lauderdale (D.E. 21).

7. To state that the Bridge Club is a historical staple of the City of Fort Lauderdale and a long time part of the fabric of the community is not an understatement. The Bridge Club, as part of its mission, also donates to important and needy charities on a regular basis. The Bridge Club donated approximately $69,000.00 from 2008-2012 to needy charities through ACBL (mandated by national bridge club organization) and directly to local charities.

8. As a non profit the Bridge Club is governed by the Board of Governors who are volunteers (unpaid) elected by the club membership for three year staggered terms. The membership hold elections each December. There is one employee who is designated as a manager and several independent contractors who serve the essential task as bridge game directors. The Bridge Game Directors oversee and manage the bridge games. The Bridge Club continually holds bridge games and is open regularly.

2

9.  The Bridge Club traditionally operated in the positive based primarily on the bridge game fees and would donate funds to needy charities and reserve funds for its building maintenance. The Bridge Club had net positive revenue of approximately $100,000 for 2008-2010. Unfortunately, this continued net positive revenue ceased pre-petition due to a substantial amount of litigation pending. (The Debtor's Debtor In Possession monthly report for March reflects net positive revenue for March 2013 of approximately $3,000 which would annualize to approximately $36,000). The pending law suits brought by a single member, Samuel D. Rosen are as follows:

> <u>Fort Lauderdale Bridge Club et al. vs. Allen Bozek, et al.</u>-Case No. 12-012934 CACE (02)
> <u>Fort Lauderdale Bridge Club vs. Fort Lauderdale Bridge Club, et al.</u>-Case No. 11-010801 CACE(14)
> <u>Samuel Rosen vs. Fort Lauderdale Bridge Club, et al.</u>-Case No. 10-019587 CACE (12)
> Claim Pending before the American Arbitration Association

10.  Mr. Rosen is a retired lawyer who was an experienced litigator in complex civil matters. The Bridge Club sought to suspend Mr. Rosen's membership due to alleged behavioral issues and did in fact vote to suspend him at a Board Meeting on February 22, 2010.

11.  Mr. Rosen first filed an action in Broward Circuit Court alleging 11 counts and 171 paragraphs to challenge the Board's actions in suspending his membership as well as various direct actions against the Bridge Club and various Board Members, former Board Members and members for Defamation Breach of Fiduciary Duty and other claims. Case # 10-019587 CACE (12) ("Rosen I"). Since then he has filed three other actions with numerous counts against, its officers, directors and others both direct and derivatively. A true and correct copy of all of Mr. Rosen's Complaints are attached as Exhibits to the Bridge Club's Motion to Allow Limited Stay Relief (D.E. 19) as to non derivative direct claims and are incorporated herein by reference.

12.  Mr. Rosen, as set forth in his affidavit in support of his Motion to Convert, claims to be owed a lot of money based on contingent, unliquidated and disputed claims, including punitive

3

damages. He also claims in his motion (¶8) to be owed attorneys fees for pursing derivative claims which he states in his affidavit are "no cost" services to the Club. However, Paragraph 8 of his Motion alleges attorneys fees and expenses owed for derivative claims of $100,000 to date. Of course, the Debtor vigorously disputes Mr. Rosen's entitlement to any attorneys fees in relation to the derivative claims or any other claims relating to the Debtor. There has been no determination of right or entitlement of any attorneys fees to Mr. Rosen to date.

13. The Bridge Club had an insurance policy in place and has been defended by counsel appointed by the carrier and such representation continues as to the currently pending direct claims brought by Mr. Rosen against the Bridge Club in Rosen I.

14. As a result of the substantial amount of litigation brought by Mr. Rosen, after an exhaustive search a new carrier insured the Debtor at a substantially higher cost and created a "Rosen" exception to the new policy providing any claims brought by Mr. Rosen against the Bridge Club and its officers and directors are not covered. The Club could not obtain other D& O coverage which protects against further Rosen lawsuits.

15. As Mr. Rosen is a retired litigation attorney, he has either pursued the actions on his own, pro se, or in conjunction with counsel he retains. The Derivative actions have been brought primarily if not entirely by Mr. Rosen pro se.

16. Due to the lack of insurance, the Bridge Club provided a defense to the defendants in the derivative actions filed by Mr. Rosen. Mr. Rosen has alleged that providing a defense was improper and that the persons defended or the attorneys should repay the money advanced for their fees and costs and/ or that the law firm who defended them should return the funds. The filing of the bankruptcy ceased such expenditures.

17. The members of the Board are volunteers, are good people and want to do the right thing for the membership and its creditors. (two were elected for the first time in December 2012)

18. It is believed that Mr. Rosen has sought to take retribution against anyone who serves and does not do what he says or thinks should be done and is utilizing the leverage of filing derivative claims to get what he wants and/or what he thinks the Club should do. The law suits, threats and intimidation are constant and relentless. Mr. Rosen recently advised he is ready to file Civil Rights Claims against the Club and others. Mr. Rosen's actions are not limited to litigants, he has filed bar complaints against at least three lawyers representing the Club and/or its Directors and one lawyer who is a member of the Club and defendant in Mr. Rosen's litigation. Mr. Rosen has likewise sought to encourage Board Members to quit and has congratulated them when they do resign. See "P.S." portion of correspondence dated March 19, 2013 from Mr. Rosen to various club members attached hereto as Exhibit "A".

19. At the time of filing the Bridge Club still had substantial funds on hand which had been accumulated over a prior tranquil period of club history, however, the litigation, including a fight over the Derivative Claims, was a substantial drain to the Bridge Club's human and financial resources. The Chapter 11 filing was and is the best alternative for all interested parties, including Mr. Rosen.

## THE CHAPTER 11 WAS FILED IN GOOD FAITH

20. The Debtor filed this Chapter 11 in good faith, not to protect third parties or delay litigation against the Club or others as alleged by Mr. Rosen, but to preserve the assets of the Bridge Club, including the unique long term lease with the City of Fort Lauderdale, preserve the funds of the Bridge Club (over $200,000 at time of filing), seek a negotiated resolution of the disputes in a single forum and stop the needless expenditure of funds and acrimony caused by the ever increasing amount of

litigation filed by Mr. Rosen and reorganize the Debtor by paying all valid creditors in full. In fact, the steps taken by the Debtor in filing Chapter 11 benefited the estate and Mr. Rosen as it ceased the substantial drain of funds being advanced to defendants in the derivative claims and litigation over whether the Bridge Club's Committee decision to not pursue the derivative claims was proper[1]. The Chapter 11 provides an ideal and unique forum of last resort for this Bridge Club to reorganize and continue into the future.

21. It is curious that Mr. Rosen asserts the Debtor filed this case to delay litigation as to the Debtor and/or third parties when in fact the Debtor agreed to stay relief as to all of Mr. Rosen's claims against any parties, including the Club.(D.E. 19) (The Court denied such relief on April 16, 2013) The derivative claims are not subject to stay relief as they are property of the estate and Mr. Rosen's right to maintain such actions extinguished upon the filing of Chapter 11 petition. In re General Development Corporation, 179 B.R. 335 (S.D. Fla. 1995).

22. The undersigned respectfully submits that under the circumstances of this case Chapter 11 is the proper forum for this Debtor to reorganize and the filing was in good faith, to preserve and reorganize the Club for the benefit of all interested parties. In fact, it is the only viable forum under the circumstances.

23. For goodness sake, Chapter 11 has become notorious for 363 sales where the sole purpose is to sell an asset for the benefit or primary benefit of a single secured creditor. The code allows for a chapter 11 for the sole purpose of assuming or rejecting leases. Chapter 11 is a proper forum for a Debtor to take control of strike litigation, in this case derivative claims brought by a member who pays $30 a year membership fee and has also alleged massive direct claims against the

---

[1] Of course, no funds have been advanced post petition for any professionals. A true and correct copy of the Committees

6

estate. This case presents facts which not only meet the purpose of Chapter 11, but illustrate the use of the provisions of the Code at their best. Clearly, saving a non profit Club with positive net income which benefits so many and is loved by so many with a rich history is a proper purpose and good faith.

24. Mr. Rosen makes broad side allegations which are simply without factual merit. The Debtor has and continues to operate and manage the Bridge Club in a proper manner and the Chapter 11 has allowed for positive net revenue, see March DIP report. There is no mismanagement or actions taken contrary to the interests of the creditors, including the contingent, disputed and unliquidated claims of Mr. Rosen. The Debtor, having only been in Chapter 11 for less than 2 months, has interviewed counsel to analyze and if appropriate pursue potential preference and/or fraudulent transfer claims. (The undersigned has provided information and has had several conversations with Robert Reynolds of Slatkin & Reynolds regarding retention concerning such actions) Unfortunately, Mr. Rosen perceives the failure to proceed with any such actions on the time and date he demands and before proper analysis and/or attempts to resolve as being in bad faith and an attempt to protect third parties. Mr. Rosen's assertions in his Motion along those lines are simply false. Any and all valid claims will be pursued in due course.

25. Likewise, Mr. Rosen asserts that the Chapter 11 was filed to protect third parties from his numerous derivative claims. As set forth above, the Debtor submits that Mr. Rosen was utilizing the derivative claims as a litigation tactic to seek leverage for his claims, cause intimidation and instability as to the Board and retribution against those he believes wronged him in the past. Chapter 11 appropriately vests those derivative claims as property of the estate. It is clearly a proper purpose of Chapter 11 for a non profit corporation to gain control of all derivative claims and formulate a fair and

---

proceedings relating to the derivative claims are attached as Part of Exhibit "D" to D.E. 19-4 and are incorporated herein.

independent process as to whether any of the claims are worth pursuing. Many were brought as recently as February 2013. Upon review of several of the claims, the undersigned submits that several of the claims are not worthy of pursuit either on the merits or financially. Mr. Rosen's alleged "no cost" services are not the standard to determine whether derivative claims should be maintained and he is certainly severely conflicted as an appropriate person to bring such claims as he has numerous direct claims against the Debtor and his stated disdain for several of the targets.[2] In regard to the claims which assert tax issues, the Debtor, through counsel is in the process of consulting with a potential expert to determine whether any of the allegations require corrective action. .

### NO GROUNDS FOR CONVERSION PURSUANT TO 1112(b)(4)(A)

26. As set forth above, there is no continuing substantial loss or diminution of the estate as alleged by Mr. Rosen. To the contrary, members continue to play and enjoy bridge at the club generating card play revenues, the overhead has remained stable and there is net positive revenue. There is and continues to be the ability to satisfy current expenses.

27. As Mr. Rosen cannot satisfy this element of 1112(b)(4)(A), his claim to convert must fail.

28. Likewise, Mr. Rosen cannot prove the second element of 1112(b)(4)(A), the absence of a reasonable likelihood of rehabilitation. This Debtor has a viable and reasonable prospect for reorganization. It has a committed membership, a rich history, an extremely reasonable overhead, remains net positive even during the bankruptcy, has no liens or secured debt and it can in all likelihood clearly pay creditors as part of a Plan of Reorganization. Mr. Rosen's claims can easily be estimated for confirmation and distribution purposes. The result may be zero. Even if Mr. Rosen prevailed on

---

[2] "No cost" is apparently not "no cost" as Mr. Rosen claims in Paragraph 8 of his Motion to be entitled to over $100,000

liability, a claim for damages against a non profit club that he should compensated for a book on bridge which was never completed or published is wholly speculative, at best. Moreover, upon information and belief coverage exists for the alleged tort claims against the Club should Mr. Rosen prevail in any respect. A contingent disputed creditor cannot assert reorganization is not possible when his claim amount may be zero or be covered by insurance proceeds. He does not hold such a veto at this time.

29. The history of the Club and its past and current performance, even in the midst of all of the litigation, clearly shows a reasonable prospect for reorganization, and woefully insufficient proof of the absence of the ability to reorganize.

## NO GROUNDS FOR CONVERSION PURSUANT TO 1112(b)(4)(B)

30. Likewise, Mr. Rosen's claims of gross mismanagement under 1112(b)(4)(B) are without merit. The current manager has done an excellent job and the Club is operating as it should. The elected board members are lay people who are unpaid and are performing their obligations to the best of their ability. They have operated in a manner that a Debtor in possession should operate and have approved all steps required by a debtor in possession all in the interest of moving this case forward, and most prominently to seek to resolve the pending disputes with Mr. Rosen and proceed toward reorganization.

31. Mr. Rosen's assertion as one of his main grounds of mismanagement is a completely baseless allegation that the Debtor has failed and refused to act in a manner in order to resolve and settle the claims of Mr. Rosen. The Board from the beginning authorized the undersigned to make all efforts, including mediation(s), to seek to resolve Mr. Rosen's claims. The undersigned expended many hours in good faith discussions with Mr. Rosen for the sole purpose of seeking to resolve his claims. The

---

in legal fees, expenses, etc., for the derivative claims he is pursing pro se.

undersigned also met with Mr. Rosen and his now counsel, Mr. Pugatch, for the same purpose. Mr. Rosen was unwilling to mediate without significant pre conditions which could not be met in the context of a Chapter 11 case. Incredibly, Mr. Rosen states in Paragraph 19 of his affidavit that settlement efforts cannot proceed and will be unsuccessful until the derivative claims in Rosen II & III are quantified.

32. The undersigned cannot reveal the other substantial pre conditions to resolution required by Mr. Rosen as they were made during ostensibly confidential settlement negotiations. The Debtor has and remains ready and willing to participate in a good faith mediation with Mr. Rosen, however, it appears Mr. Rosen has chosen his path, to attempt to close the Club.

33. This brings to the forefront a question posed by your honor, Judge Ray, to Mr. Rosen, at a hearing on April 16th 2013—Do you want to destroy the Club? (paraphrasing the question as the undersigned does not yet have a transcript) The nature of his Motion to convert reveals his answer to the Court's question.

34. The Debtor respectfully submits that the following question is an important one in the context of this case and the motion to convert—WHY SHOULD A SINGLE MEMBER WITH DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS HAVE THE POWER TO BRING DOWN A CLUB WITH A SOLID REVENUE BASE, AN IMPORTANT FUNCTION FOR THE ELDERLY CITIZENS WHO ENJOY IT, AND PROVIDE MUCH NEEDED DONATIONS TO NEEDED CHARITY? The answer is clear, it should not and only Chapter 11 provides the prospect and code supported remedies to allow this club to reorganize.

35. Simply put, Mr. Rosen's claims should be estimated as part of a plan for confirmation and distribution purposes and if anything is owed he will be paid 100% from insurance proceeds or if

required, the Club's funds. Of course, if his claims are nothing or nominal, the plan would be confirmed and all creditors would be paid 100%. Mr. Rosen would not be an impaired creditor. The derivative claims will be pursued or not pursued based on an independent person appointed by the Court pursuant to the Plan or prior thereto and any and all preference or fraudulent transfer claims will be pursued as appropriate.

36.     Mr. Rosen says it all in the last paragraph of his Motion, according to him "reorganization is impossible", even with a chapter 11 Trustee in place, "unless the trustee is prepared to spend substantial legal fees to litigate the derivative claims of Rosen II and III which Rosen has been litigating at no cost to the Debtor". Again the person who has now conceded that he wants to kill the patient is asserting that only his "no cost" legal services as a non licensed retired lawyer in pursuing the derivative claims he brought can save the patient. (Mr. Rosen's term "no cost" should be interpreted loosely as he is seeking substantial attorneys fees for his services in the derivative claims as set forth in Paragraph 8 of his Motion).

37.     Mr. Rosen's logic is not only self-serving, but contorted. Mr. Rosen has never been willing to have an independent person analyze his many derivative claims to stand the test of rationality either on the merits or economically. Simply because claims can be brought at allegedly "no cost" by a retired lawyer with direct claims against the Club and many individual members does not mean they should. In fact, the undersigned submits that it is likely an independent person charged by the court to determine (1) if the claims have merit and (2) if so are they financially worth pursuing may determine in the negative to both questions. If the claims have material merit and value, a bonafide licensed lawyer without conflicts of interest will pursue them on behalf of the Club. That is an analysis and occurrence which happens in every case and is not an impediment to reorganization, rather it is part of

the process. The Bridge Club and its assets are at risk by Mr. Rosens pursuit of the derivative claims, as it is the Bridge Club exposed to liability for attorneys fees and costs if some or all of the derivative claims fail, not Mr. Rosen. It is Mr. Rosen who has the free ride, not the Bridge Club. Phillips v. Tobin, 548 F.2d 408 (2nd Cir. 1976) (Non lawyer cannot represent corporation in a derivative suit brought by non lawyer on behalf of the corporation)

38. For these reasons derivative claims become property of the estate and the right to continue or bring derivative claims vests solely in the debtor in possession. In re General Development Corporation, 179 B.R.335 (S.D. Fla. 1995); Matter of Consolidated Bancshares, 785 F.2D 1249, 1253-54 (5th Cir 1986). In re American of Ashburn, Inc., 805 F2d 1515 (11th Cir 1986). Mr. Rosen's right to maintain the derivative claims were extinguished by the bankruptcy filing as a matter of law.

39. The Debtor through an independent person appointed by the Court or a Chapter 11 Trustee would perform this task as is performed in every case where derivative claims exist. Mr. Rosen realizes he will not be able to control a Chapter 11 Trustee and certainly does not want a situation where the membership sees that an independent person has determined that some or all of his derivative claims lacked merit or are otherwise not worth pursuing or that they be pursued by someone applying economic realities rather than a conflicted free for all.

40. Mr. Rosen's affidavit is nothing more than a recitation of his view as to the history and status of his many claims and demands and his version of what were apparently confidential settlement negotiations. The assertions not addressed above are disputed and largely, if not completely irrelevant to the Motion to Convert. To the extent there is relevance to any statements for the purposes of the Motion

to Convert, they will be further controverted by appropriate witnesses at the evidentiary hearing.[3]

41. There are some things worth fighting for and saving, this club, with its rich history, ongoing vitality and charitable mission is one of those things. While the 600 plus members are primarily elderly, they are engaged, stimulated and carrying forward a great tradition of friendly competition, social interaction and community giving. One visit to the Bridge Club reveals that it is in no way a relic of the past, rather, it is a reflection of the past, a current gem and a link to the future. In many ways this case is a reflection of our society—do we blow up valuable institutions up because common sense cannot prevail or be prevailed upon, or do we put in the work to preserve and protect a treasure so important to many and a positive force for our community in the best interests of all parties. The undersigned submits it is worth saving and the past and current operations support such a conclusion as well as the will of the membership.

42. Based on the above, there is no just cause to convert this case to Chapter 7 at this time. There is no "conglomerate" of factors or facts supporting bad faith and there is a reasonable hope or prospect for reorganization. The use of this Court's equitable powers strongly supports denying Mr. Rosen's relief at this time. There is a reasonable likelihood of rehabilitation – successful maintenance of business operations – as the Debtor is already doing same and has done so since 1958. The Debtor can confirm a plan utilizing the provisions of the Code and a disputed, contingent and unliquidated claimant should not have veto power over the preservation and continuation of the Debtor. The fight in this case is not whether bankruptcy is proper, as Mr. Rosen prefers conversion over dismissal, rather, it is over whether this Debtor is worth saving based on a reasonable hope of reorganization. Such

---

[3] It would be improper and wasteful to seek to characterize or conduct a mini hearing as to Mr. Rosen's view of his claims, demands and the various litigations he has filed. Suffice to say the attorneys who are and were defending the actions brought by Mr. Rosen and the parties strongly disagree with his version and characterization of the litigations and settlement negotiations.

13

reasonable hope and prospect exists and Mr. Rosen has failed to demonstrate the absence thereof.

43.     Based on the foregoing, the relief sought is improper as a matter of law and should be denied.[4]

**WHEREFORE**, the Debtor respectfully requests the Court to enter an order denying Mr. Rosen's motion to convert this case to Chapter 7.

Dated this 19th day of April, 2013.            Respectfully submitted,

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court of the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).

GAMBERG & ABRAMS
*Attorneys for Debtor*
1776 North Pine Island Road, Suite 309
Fort Lauderdale, Florida 33322
Telephone:    (954) 523-0900
Facsimile:     (954) 915-9016
Email:          tabrams@tabramslaw.com

By: /s/ Thomas L. Abrams
       Thomas L. Abrams, Esquire
       Florida Bar No. 764329

---

[4] The Debtor will present witnesses at the evidentiary hearing in opposition to Mr. Rosen's Motion.

**SAMUEL D. ROSEN**
**10175 COLLINS AVENUE**
**APT. 502**
**BAL HARBOUR, FLA 33154**
**TEL. 305-868-6096 CELL 917-974-7588**

March 19, 2013

Mr. Robert Graniere
843 NE 17th Avenue #1
Fort Lauderdale, FL 33304

Ms. Ina Blum
706 NE 17th Road
Fort Lauderdale, FL 33304

Close Ms. Joan Kaplan
1023 SE 6th Street
Fort Lauderdale, FL 33301

Mr. Peter Schoen
9850 SW 2nd Street
Plantation, FL 33324

Ms. Fran Menzel
false 761 E. Coco Plum Circle #1
Plantation, FL 33324

Mr. John Hart
626 NE 2nd Avenue
Fort Lauderdale, FL 33304

Galleries
of
by   Ms. Betty Wingate
2497 NW 49th Terrace
Coconut Creek, FL 33063

Dear 2013 Board Members,


EXHIBIT "A"

http://hosting-24233.tributes.com/show/Esther-M.-McKee-95409199          3/12/2013

By letter dated February 6, I asked each of you to disclose information regarding any insurer who may provide coverage for any of the claims against you asserted by me in my newest Complaint (the one I filed on February 20) within 30 days. None of you have responded. That's ok with me, but I want to caution you that if you have any such coverage under, e.g., a homeowner's policy, an umbrella policy, your failure to comply with the Statute may well give your insurance carrier a reason to later deny coverage. Just a heads up. Do whatever you want.

Further, by way of an update, after many, many hours of meetings and discussions with your bankruptcy counsel, Tom Abrams, my attorney and I have concluded that there is no chance of an all-party mediation to resolve the only claims I have (and have ever had) against the Club, *i.e.*, my 2010 lawsuit challenging – successfully – my expulsion (the case known as "Rosen I"). I do not here try to assess fault for this failure save to note that Tom takes his instructions from President Bozek and cannot do what Bozek does not approve.

As you surely know, this means that the only probable outcome is an Order directing liquidation of the Club and its assets (and a Motion for that relief is being prepared now), unless some other creative approach is available. After giving it a lot of thought, and not wanting the Club to die, I have come up with an alternative which, although inferior to the all party mediation, including me, the Club, the individual Defendants (*e.g.* Cronrath, de Young, Guida, Short, etc.) and the insurance carrier, at least has some hope of succeeding. It is a settlement just between me and the Club without the participation of the others – no big loss since the insurance carrier long ago denied any coverage for the Club. However, I am not willing to see this proposal torpedoed by Bozek and you compliant Board Members. Indeed, given the heat you people took last Thursday from the membership, it seems appropriate to schedule a Special Membership Meeting so that the many concerned members can hear the truth about what's been going on and provide guidance to you folks. I would suggest that the Notice not pull any punches and advise members that a Motion to Liquidate the Club will be made very soon – well before the April Board Meeting – so that this is probably the most important meeting they have ever had (and could well be their last).

You should also advise the membership that I have agreed to attend, will inform them of the truth of what the Board has not told them, including where we are, and I will stay as late as necessary to answer all questions, and propose a path to settlement. I also think that Tom Abrams should be there.

I only have a couple of conditions to doing this meeting:

1. The microphone is working;
2. A quorum of members is present so votes can be taken on anything that comes up. This should be no problem for Bozek and crew since they were successful in rounding up almost 200 members for the December 20 meeting on the By-Law Changes;
3. I don't want to see Peter Schoen – the designated bomb thrower – Diane Kirsch – the timekeeper – or Brad Walters – the "let's throw Sandy out again" cheerleader. If they come, let them sit way in the back so I don't have to look at them; and
4. If I am heckled, I expect Bozek to immediately throw that person or persons out of the meeting. If not, I will leave. I have no intention of being abused again by the Club's miscreants.

I am available for this meeting anytime on March 27, March 28, April 1, and April 3. Also at 4:15 p.m. on March 26. No meeting, no more options. Liquidation to follow.

Yours truly,

Samuel D. Rosen

SDR/cc

P.S. Congratulations to Ina for being the first one to see the light and resign from the Board. She joins the two smartest people on the 2012 Board who both resigned – Ron Weissberger and Tom McKay. Oh, that reminds me, Allen if you think that crap you pulled at the February Board meeting amending the new By-Laws to insure that I not be on the Board was a smart

thing to do, think again. Likewise your decision to not fill Ina's seat rather than put me on the Board. Not Smart.

cc: Mr. Allen Bozek
    Mrs. Barbara Tate
    Mr. Keith Gellman
    Rosemary Bowden
    James & Irma Willenburg
    Gene Petry
    Ron Weissberger
    Bella Ionis-Soren
    Marty & Gloria Ezrin